Filed 05/24/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SEKAYI RUDO WHITE, | |
| Plaintiff and Appellant, | G058289 |
| v. | (Super. Ct. No. 30-2015-00777735) |
| MICHAEL MOLFETTA, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge. Affirmed.

Sekayi Rudo White, in pro. per., for Plaintiff and Appellant.

Kenneth A. Reed for Defendant and Respondent.

## INTRODUCTION

The practice of law has become complex and difficult. If practiced as it should be – as a profession – it has never been easy. But the demands on counsel's time and talent have multiplied exponentially of late, and the 21st Century practitioner's responsibilities far outstrip those we bore 25 years ago.

But recognition of this fact should be an inspiration to excellence rather than an explanation for failure. No matter how stressed and challenged they may be, lawyers must treat clients – all clients – with basic professional courtesy. That seems rudimentary, but it's often overlooked or neglected. It shouldn't be.

Appellant White is an incarcerated and self-represented plaintiff who brought the present action in tort after his criminal defense lawyer, respondent Molfetta, failed to respond to repeated requests for his case file. Having exhausted all avenues of direct state appeal of his conviction, White wanted to use the file to help him prepare petitions for collateral habeas relief.

Molfetta received White's letters, but believed he was prohibited from producing the file because it included protected materials. This was a reasonable concern. But his response to it was not. Instead of explaining the problem directly to his former client and producing the unprotected parts of the file, Molfetta effectively ignored the letters.

He produced the file, sans protected materials, only after being ordered to do so by the trial judge in the present lawsuit. He was two years late. By that time, White's deadline to file a federal petition for writ of habeas corpus had expired. (See 28 U.S.C. § 2244, subd. (d).) His petition in the state court was also denied. He sued to recoup the money he spent reconstructing the file, later asking for emotional distress damages. He got neither.

We cannot condone such laxity on the part of a lawyer toward his client. But absent a miscarriage of justice (of which we have no evidence here) our moral and

2

professional assessments, however deeply felt, cannot create a cause of action in tort. As explained herein, we must agree with the trial court: White failed to adequately plead and prove injury from Molfetta's wrongful behavior. We therefore affirm its judgment in Molfetta's favor but we publish in the hope the embarrassment we feel about the case can lead to improvement.

## FACTS

White was arrested and charged in April 2007 with multiple violent felonies and sexual crimes. He was represented at first by his own privately retained counsel, but after the preliminary hearing, he switched to the public defender's office. There were conflicts which required changing counsel again, and ultimately he was represented at trial by Attorney Frederick L. McBride.

On February 2, 2011, a jury convicted White on all counts with which he was charged. White claimed ineffective assistance of counsel by McBride, who then declared a conflict. On May 13, 2011, respondent Michael Molfetta was appointed to represent White. Molfetta obtained White's case file from McBride after his appointment. He filed a motion for new trial on White's behalf and represented him through his sentencing, where White was sentenced to 112 years to life in prison. On or about August 7, 2012, Molfetta filed a notice of appeal on White's behalf.

Shortly thereafter, Attorney David Morse was appointed to represent White on the appeal. Morse penned a letter to White dated October 22, 2012, explaining the appeal process and stating he had received the trial court record but had not yet had an opportunity to review it. Morse's letter was sent to the wrong prison, and White apparently did not receive it.

After completing his review of the trial court record, Morse wrote White at the correct address in February 2013 to advise him he would shortly be communicating regarding the issues to be raised on appeal. Two months later, he wrote again to say he had raised only two issues in White's appellate brief. There were four other issues White

3

wanted raised, but Morse explained why he did not think those arguments would prevail, and they were not raised.

This court affirmed White's conviction in an opinion filed on December 31, 2013. On March 19, 2014, the California Supreme Court denied White's petition for review.

A month later, Morse wrote White to notify him of the denial of his state Supreme Court petition. The letter further advised White of the one-year statute of limitations for bringing a petition for writ of habeas corpus in federal court. White was told his time to file would begin to run 90 days from the date his state Supreme Court petition was denied, making June 16, 2015 his deadline.

Two months later, on June 26, 2014, White wrote to Molfetta, requesting he turn over the case file so White could use it to prepare a habeas petition. Molfetta did not respond to the letter. Six weeks later, on August 8, hearing nothing from Molfetta but hearing the clock ticking loudly, White wrote a letter to the State Bar of California, advising that Molfetta had failed to reply to his request.

On January 21, 2015, still having heard from no one, White wrote a second letter to Molfetta, demanding Molfetta either deliver the file to him or respond so White could make arrangements to have his father pick up the file from Molfetta. Molfetta made no written response to this letter either.[1]

The State Bar took six months to respond to White's inquiry[2] on February 25, 2015, at which belated time it stated it would require Molfetta to get in contact with

---

[1]    In his trial testimony, Molfetta indicated he had spoken at some point by telephone with White's father, but it is not clear from the record when this conversation took place. Molfetta told White's father he would release the case file to him only if White obtained a court order authorizing it and only if White's father came to Molfetta's office to retrieve it. The record itself provides no clues as to whether and when White himself became aware of this conversation prior to litigation but at oral argument, White claimed he did not become aware of it until he heard Molfetta's trial testimony, and Reed was unable to enlighten us on this point. Either way, Molfetta's response was inadequate; it should have been made to the client.

[2]    There's plenty of blame to go around here. A copy of our opinion will be sent to the State Bar with an inquiry about their delay.

4

White within 10 days of the letter to make arrangements for the file to be picked up from his office.  It said it would take no further action unless Molfetta failed to contact White.  We are unable to find any evidence Molfetta contacted White within 10 days of the State Bar's letter.  This ball got dropped a lot.

Meanwhile White, daunted but undeterred, pursued another avenue of request:  his criminal case.  On January 2, 2015, he filed an application for an order compelling Molfetta to return his file under Penal Code section 1054.9 and Rule 3-700 of the Rules of Professional Conduct.  One month later, on February 5, 2015, the criminal court summarily denied White's request as an improper ex parte communication, explaining – in a Kafkaesque but perfectly explicable ruling – that it believed it had no authority to grant the relief since the case was final and on appeal.  White apparently did not seek redress from this ruling.

With only months remaining in the limitations period, White tried a third track.  He filed this lawsuit on March 11, 2015.  But the case did not progress prior to the presumed expiration of White's federal habeas deadline.  On February 8, 2016, Molfetta's counsel, Kenneth Reed, indicated he would send White the portions of his file not containing material subject to protective order, including victim information such as rape kits.  As of the status conference *almost six months later*, on July 25, 2016, Reed had not yet forwarded the unprotected parts of the file, so the trial court *ordered* him to mail to White *in three days' time* the parts of his file to which White was entitled.  Reed took longer than three days – he took five times that long – to comply with the order.[3]  More than two years after requesting it, White finally had his file in hand on August 10, 2016.

White's original complaint in this matter contained no explicit cause of action.  It claimed as damages the cost of reconstructing the contents of the file – in his estimation, about $175,000.  After the file was returned, however, he amended the

---

[3]     Sigh.

complaint to specify his claims were based on the torts of conversion and intentional infliction of emotional distress. In connection with his conversion cause of action, he alleged special damages consisting of the previously mentioned file reconstruction costs as well as damage to his ability to pursue postconviction relief. His pleading did not allege emotional distress in connection with the conversion claim; only in connection with the intentional infliction of emotional distress claim.

The case went to a bench trial. In his trial brief, White for the first time suggested he was seeking emotional distress damages in connection with the conversion claim.[4] In its statement of decision, the trial court made clear it did not think Molfetta was still holding back any parts of the file to which White was entitled. The only items being withheld were two CDs of rape exam photographs to which he was not entitled. The trial court also found there was no credible evidence of emotional distress resulting from Molfetta's delay in returning the file. It did not, however, specifically address whether White could or should recover any emotional distress damages for his conversion cause of action.[5] Nor did it address whether he should recover any damages for file reconstruction. Instead, it found White had not shown credible evidence that his postconviction efforts were impaired or harmed by what the trial court found to be an "unreasonable delay" by Molfetta in returning the file. White took nothing by his complaint.

## DISCUSSION

White contends the trial court should have awarded him special damages and emotional distress damages for conversion because it found Molfetta wrongfully interfered with his possession of the file. He argues the trial court failed to apply the

---

[4]    Prior to amending the complaint, White filed a summary judgment motion in which he sought judgment for $17,905 in actual damages (reconstruction costs) and $90,000 in punitive damages.

[5]    It did address emotional distress in its findings related to the intentional infliction of emotional distress claim. It found there was no credible evidence White had suffered severe or extreme emotional distress. As far as we can ascertain, White's appeal focuses only on the conversion claim.

6

established standard for conversion damages under Civil Code section 3336 and committed prejudicial error in failing to consider whether emotional distress damages were due for the conversion. He is incorrect.

These issues present mixed questions of law and fact so we employ both the substantial evidence and de novo standards of review. (See *Bank of America v. Giant Inland Empire R.V. Center, Inc.* (2000) 78 Cal.App.4th 1267, 1276-1277.) That is, we review the trial court's factual findings for substantial evidence, but we independently review its resolution of legal questions.

The trial court did not err in declining to apply Civil Code section 3336 to this case. To explain why, we must emphasize the legal distinction between proving the *fact* of damage as opposed to proving the *amount* of damage. "'Injury' refers to the *fact* of harm suffered by the plaintiff due to the defendant's conduct. 'Damages' refers to the monetary sum that the plaintiff may be awarded as *compensation for the injury*. To recover in tort, the plaintiff must prove the *fact* of proximately caused injury with reasonable certainty. (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873.) When the *fact* of proximately caused injury is proven sufficiently, the measure of damages to be awarded need only be shown with the degree of certainty that the circumstances of the case permit. (*Ibid*.) But where the *fact* of proximately caused injury is not proven with reasonable certainty, the plaintiff cannot recover regardless of how much evidence was introduced to show the measure of the recovery sought by the plaintiff. (*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 531; *S.C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536–538.)" (*Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302-1303, italics added (*Lueter*).)

Two cases, *Lueter* and our decision in *Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688 (*Virtanen*), help illustrate this crucial distinction. In the former case, Lueter was driving one of his company's trucks on the interstate when his front tire blew

7

out, causing a multi-car accident. Responding officers from the California Highway Patrol (CHP) took a piece of the tire's tread back to the station to determine whether it might be an illegal recap. (*Lueter, supra,* 94 Cal.App.4th at p. 1290.) Company officials claimed they had asked the police to return the tread to them, but police disputed this. Once CHP officers determined there had been no citable offense committed with respect to the tire, CHP personnel discarded the tread. A person injured in the accident thereafter sued Lueter and his company for negligence. In turn, Lueter and the employer cross-complained against the tire's manufacturer, claiming the tire was defective. However, Lueter's expert could not render an opinion because CHP had discarded the tread. Lueter and his company dropped their cross-complaint against the tire manufacturer and filed a new cross-complaint against the CHP, among others, for negligent spoliation and conversion of the tread. (*Id.* at pp. 1291-1292.)

The trial court in the case instructed the jury it need not find the tire was actually defective in order to find CHP liable, so long as they found the tread *might* have constituted evidence. Not surprisingly, the jury found CHP was liable for conversion. (*Lueter, supra,* 94 Cal.App.4th at p. 1292.) However, Lueter and his employer appealed the nominal $1.50 damages award they received on the claim. The Third District Court of Appeal affirmed the nominal damages award. It observed Lueter and his employer could not establish the tread had any evidentiary value because the expert had concluded the accident was likely caused by a road hazard rather than a defective tire, and he only wished to examine the tread to finalize his findings. (*Id.* at pp. 1298, 1303.) There was no reasonable probability the tread would have helped Lueter and his employer establish a claim against the tire manufacturer. They could not recover damages because they could not show the loss of the tread caused them anything more than speculative harm – the same hurdle White is unable to clear.

*Virtanen* demonstrates the converse. In that case, the plaintiff, Virtanen, had preliminarily agreed to sell shares of stock to two buyers. (*Virtanen*, *supra*, 140

8

Cal.App.4th at p. 694.)  The buyers' attorney, O'Connell, who ultimately was the defendant on appeal, agreed to hold the shares in escrow pending the close of the sale and to release them to the buyers' agent upon satisfaction of certain conditions, including the execution of a purchase agreement.  (*Id.* at pp. 694-695.)  But before the purchase agreement was signed, Virtanen decided not to go through with the sale and rescinded the transaction, demanding O'Connell return the stock certificates to him.  O'Connell refused and proceeded to transfer the certificates to the buyers.  (*Id.* at p. 695.)  A jury found him liable for conversion of the certificates.  (*Id.* at p. 696.)

O'Connell maintained Virtanen had no damages, even if there was a conversion, because after initiating the lawsuit, Virtanen had received many of the shares back in a settlement with the buyers.  (*Virtanen, supra,* 140 Cal.App.4th at p. 708.)  We rejected this argument, noting, as White does here, that a plaintiff can still sue for damages from conversion even if the property is returned.  (*Id.* at p. 707.)  But Virtanen had presented evidence of another prospective buyer in the wings who would have been willing to purchase the shares for a higher price had they been available.  (*Id.* at p. 708.)  By the time Virtanen had settled his claims against the other buyers and received the shares back, the prospective buyer had concluded the stock was worthless and was not willing to buy it.  (*Id.* at p. 709.)  So Virtanen had evidence of actual harm.  He was not speculating that he would have been able to sell the stock to some unidentified buyer for a higher price.  He had evidence of an actual buyer, and the sale had fallen through because of the conversion.

Leaving aside emotional distress, which we will address shortly, White claims his pursuit of postconviction relief, both on appeal and in the form of habeas corpus petitions, was harmed by Molfetta's withholding the file.  But, as the California Supreme Court has recognized, harm is often uncertain in situations where the plaintiff claims he would have prevailed in a court of law absent the defendant's conduct.  (See *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 14-15.)

9

And so it is here. White notes two ways in which his postconviction prospects were harmed. He says the Orange County Superior Court denied his state habeas petition in part because some of the grounds he raised were not raised on appeal. And he also claims the conversion prevented him from filing a timely federal habeas petition.

On the state habeas petition, White's argument goes something like this. Molfetta's failure to forward the file impaired Morse's ability to use the information therein to develop arguments on appeal. Molfetta is thus responsible for Morse's failure to raise any argument ascertainable from the file, which in turn, foreclosed them as grounds for granting his state habeas petition.

The problem with this argument is twofold. First, while the client's file is the property of the client, in California, the obligation to turn it over is activated by a *request*, either from the client himself or from the client's new counsel. (See *Rose v. State Bar* (1989) 49 Cal.3d 646, 655 (". . . there can be no doubt that the balance of an attorney's litigation file is the property of the client and must be surrendered promptly *upon request to the client or the client's new counsel* once the representation has terminated.") (Italics added.) White does not show Molfetta was obligated to forward the file to Morse absent a request, and Morse never made a request.[6] Indeed, the fact White wrote to Molfetta rather than Morse to request the file indicates he was aware Molfetta had in fact not forwarded it to Morse.

White himself did not request the file from Molfetta until June 2014, after his appeal had concluded. Since Molfetta did not have an obligation to turn the file over until it was requested, Molfetta was not interfering with White's possession of the file until June 2014. So there could be no legally cognizable failure until June 2014. That is

---

[6] Whether Molfetta's policy and practice *should* have encompassed turning the client's file over to appellate counsel as a courtesy, and whether Morse *should* have requested the file from Molfetta himself are questions we have neither the record nor the authority (not having a professional negligence issue before us) to decide.

10

when the conversion would have begun, and Molfetta cannot be legally responsible for what occurred in the state appeal months prior to that request. To the extent the habeas petition was denied for failure to raise arguments on appeal, said harm was not legally attributable to Molfetta.

As to White's federal habeas petition, at the time this lawsuit went to trial, White had not yet filed one. Even though his statutory deadline to file a petition for writ of habeas corpus under 28 U.S.C. section 2244, subdivision (d) had run by the time he received the disclosable portions of the file in August 2016, the limitations period is subject to equitable tolling where the prisoner has been prevented by extraordinary circumstances from presenting his petition in a timely manner, but has shown diligence nonetheless in pursuing it. (See *Butler v. Walsh* (E.D.Pa. 2012) 846 F.Supp.2d 324, 330-331 (*Butler*).) The prisoner in *Butler* filed his petition only a few days late due to extraordinary circumstances and was granted relief. (*Id.* at p. 331.)

Here, almost three years after receiving his file back, White had still not filed his federal habeas petition. Neither we nor the trial court can speculate as to what the outcome of his federal habeas petition would have been had Molfetta timely returned the file because White did not expeditiously pursue the petition. Indeed, our research indicates White did not constructively file a federal habeas petition until approximately April 2020. (*White v. Covello* (C.D.Cal. Nov. 16, 2020, Case No. 8:20-CV-00814 JLS (KES)) 2020 U.S. Dist. LEXIS 246066, at p. *1 (*White I*).) In response, the warden moved to dismiss the petition as untimely, and said motion was granted by the federal district court on recommendation of the magistrate judge. (*White v. Covello* (C.D.Cal. Jan. 4, 2021, Case No. 8:20-cv-00814 JLS (KES)) 2021 U.S. Dist. LEXIS 783, at p. *1.) The magistrate judge felt "Molfetta's failure to return the file until Petitioner filed a civil complaint was 'sufficiently egregious' to justify equitable tolling of AEDPA's one-year limitations period. . . . However, once Petitioner received his case file in August 2016, AEDPA's one-year statute of limitations began. . . . Petitioner provides no credible

evidence why he waited from August 2016 until March 2018 to begin his first round of habeas petitions in the state courts." (*White I, supra,* at p. *11.) Thus, even if the federal court were willing to equitably toll White's deadline to March 2018, it stated the petition would still be untimely because White filed it nine weeks after the deadline as tolled. (*Ibid.*) In short, even though Molfetta wrongfully withheld the file, our research discloses White's own delay was the reason for the dismissal of his petition. Said legal harm is not directly traceable to Molfetta's wrongful conduct, and consequently, it is not compensable under Civil Code section 3336. The trial court did not err, therefore, in refusing to apply the statute.

Which brings us to emotional distress. White correctly observes that Division One of our court has ruled a plaintiff may recover damages for emotional distress resulting from a conversion. (See *Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464, 477 (*Gonzales*).) There, Mrs. Gonzales, the plaintiff, entrusted numerous valuables, family mementoes, keepsakes, and rare items to a self-storage facility after she had to sell her home due to a divorce. She told the person showing her the storage unit she was storing valuables and keepsakes there. She later had trouble making rent payments (*id.* at p. 469), and without giving her a preliminary lien notice, the facility set up an auction. (*Id.* at pp. 469-470.) Having learned about the auction, an impostor appeared at the facility claiming to be Mrs. Gonzales and removed the items. The employees on duty allowed the removal without asking for any identification to confirm the person was Mrs. Gonzales. (*Id.* at p. 470.) When the true Mrs. Gonzales contacted the facility to bring her account current, she discovered what happened. She was so emotionally devastated that she withdrew from her formerly active social life, abandoned her retail business, and developed depression. (*Id.* at p. 470.)

Mrs. Gonzales sued, alleging contractual causes of action, a warranty claim, negligence, and conversion. (*Gonzales, supra,* 56 Cal.App.4th at p. 471.) Amongst other damages, the jury awarded the plaintiff over $200,000 in emotional distress damages.

12

(*Ibid*.)  Citing the California Supreme Court's decision in *Schroeder v. Auto Driveway Co.* (1974) 11 Cal.3d 908 (*Schroeder*) and the Restatement Second of Torts, section 927, Division One determined emotional distress directly stemming from the conversion of property was compensable under the damages formulation of Civil Code section 3336. (Gonzales, supra, 56 Cal.App.4th at pp. 475-476.)

We find *Gonzales'* conclusion mostly persuasive.[7]  So, in theory, we agree White *could* have a claim for emotional distress damages resulting from the conversion of his case file.  But the trial court found he failed to present evidence of it.  Mrs. Gonzales presented undisputed evidence of severe emotional distress "caused by the loss of her treasured personal belongings." (*Id.* at p. 478.)  She refused to come out of her room for a week, lost her business, and withdrew from her activities.  She was *medically diagnosed* with depression, which impacted her daily life in concrete ways which her evidence elucidated.  Here, it appears the only evidence of emotional distress was White's testimony that he was "upset by the delay."  With so little to work with, we can discern no error in the trial court's inability to find compensable emotional distress damage as a result of Molfetta's conduct.

There is also a technical problem with White's argument.  White's operative pleading did not explicitly seek emotional distress damages in connection with his conversion cause of action.  Instead, his conversion claim focused on the cost of reconstructing the file and the damage done to his legal prospects.

Additionally, the trial court clearly stated it did not believe White had any emotional distress damages from the delay in returning the file.  While the trial court may

---

[7]     We cannot speak to Division One's certitude that *Schroeder* sanctions the recovery of emotional distress damages for conversion except in dicta.  The Schroeders had also alleged a fraud claim which would have supported such damages.  (See *Sprague v. Frank J. Sanders Lincoln Mercury, Inc.* (1981) 120 Cal.App.3d 412, 417.)  It is unclear from the opinion whether the high court approved the recovery of emotional distress damages in the case because of the fraud claim or because of the conversion claim.  We do not believe *Schroeder necessarily* implies that emotional distress damages are recoverable where conversion alone is claimed but we have no occasion to question that conclusion here, and if it's as accurate as the rest of the *Gonzalez* opinion, it's dead on.

13

have erred in omitting this statement from its analysis of the conversion claim, White failed to object to this omission. (See Code Civ. Proc., § 634.) Instead, he objected to the trial court's finding on *proof* of emotional distress, arguing his continued incarceration necessarily supported an emotional distress finding, an argument that fails in light of the failure to show his continued incarceration was caused in any way by failure to provide the file, as discussed above. Because White failed to object to the specific omission to which he now points, we must imply the findings necessary to support the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134.) When we do so, the trial court's finding on emotional distress damages generally is applicable to the conversion claim specifically.

In ruling as we do, we do not wish to minimize the emotional impact of incarceration, especially if one genuinely believes it to be wrongful or in error. It is neither our place nor our intention to diminish the suffering of anyone whose quest for post-conviction relief is hampered or harmed by facts such as these. But evaluation of the fact of such impact – as well as the legal sufficiency of White's habeas petition – is a task that has fallen to other colleagues, and they have reasonably ruled against White.

So we are left with the proverbial wrong for which there is no remedy. Or, more precisely, we are left with a wrong from which there were no damages – at least no legally cognizable damages. We offer no succor to those who let White down, and we admonish all who would consider similar inaction to give serious thought to the potential consequences. The next such petitioner may well be able to establish one of the things White was not and thereby prove damages.

But more than the liability exposure inaction of this type entails, there is the professional failure to consider. While we have spoken to the difficulty and complexity of the modern practice of law, we cannot let ourselves be satisfied with Kurt Vonnegut's lament that "It is embarrassing to be human." Human frailty will result in occasional

14

failure, as it did here.  But we must strive constantly to fight against such failure.  And we must do better.

We are a profession.  Like doctors and ministers and scientists, we have an obligation to perform to the absolute best of our abilities regardless of our own circumstances or those of our client.  We owe more than was provided here.  But on the facts of this case, the law does not permit a recovery.

### DISPOSITION

The judgment is affirmed.  Each party to bear his own costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


ARONSON, J.

15